## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **JANET D. MATTINGLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:12cv0055 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Janet D. Mattingly for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433.  The case is before the Court for review and final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).

## Procedural History

Janet Mattingly (Plaintiff) applied for DIB in August 2006, alleging she had become disabled on June 30, 2006, by manic depressive disorder, bipolar disorder, traumatic stress disorder, severe depression, panic, anxiety, suicidal thoughts, schizophrenia, and arthritis in

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security in February 2013 and is hereby substituted for Michael J. Astrue as defendant.  See 42 U.S.C. § 405(g).

her back and legs.  (R.[2] at 172-78, 193.)  Her application was denied initially and following

a hearing held in September 2010 hearing before Administrative Law Judge (ALJ) Douglas

S. Stults.  (Id. at 7-47, 55-98, 105-06, 109-13.)  The Appeals Council denied Plaintiff's

request for review, effectively adopting the ALJ's decision as the final decision of the

Commissioner.  (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Denise Waddell, C.R.C.,[3] testified at the

administrative hearing.

Plaintiff, fifty years old at the time of the hearing, testified that she lives with her

husband.  (Id. at 60.)  She finished the eleventh grade, but not the twelfth, and had never

obtained a General Equivalency Degree (GED).  (Id.)

Plaintiff described her headaches as occurring between one to three times a week and

lasting one to two days each time.  (Id. at 61.)  They are a stabbing pain above her eyes.  (Id.

at 62.)  She has been to a hospital because of her headaches, but can not remember how

often.  (Id.)  The medication given her at the hospital puts her to sleep.  (Id.)  The medication

she takes at home and hot showers give her no relief.  (Id. at 62-64.)  She has been having

these headaches for approximately twenty years.  (Id. at 63.)  When she has a headache, she

lies in a dark, quiet room and cannot focus.  (Id. at 64.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with her
answer.

[3]Certified Rehabilitation Counselor.

Plaintiff has difficulties sitting because she broke her pelvic bone in three places when she was younger.  (Id. at 65.)  She cannot sit for longer than thirty minutes before having to stand for at least sixty minutes.  (Id.)  She can only stand for sixty minutes before her pelvis starts bothering her.  (Id. at 66.)  She can walk no farther than three blocks.  (Id.)

Plaintiff also has chronic obstructive pulmonary disease (COPD) and shortness of breath.  (Id.)  She cannot do housework for longer than forty-five minutes before the shortness of breath stops her.  (Id. at 67.)  It then takes thirty minutes for her to catch her breath.  (Id.) She was diagnosed ten years ago with  irritable bowel syndrome (IBS); it causes diarrhea and makes her go to the bathroom a lot.  (Id. at 90, 93.)  Usually, she goes five to six times a day; sometimes, she goes fifteen times a day.  (Id. at 91.)  She has stomach cramps that are worse when she eats. (Id. at 92.)

Plaintiff testified that she was sexually, physically, and emotionally abused by her father from when she was a little girl until she was nineteen years old.  (Id. at 68.)  She has bad days where she cannot get out bed.  (Id. at 69.)  On bad days, she does not eat or drink water.  (Id. at 76-77.)  She either stays in bed or sits on the couch.  (Id. at 77.)  She has hallucinations "[a]bout every day."  (Id. at 69.)  She has been hospitalized for psychological reasons, but cannot remember how many times.  (Id. at 69-70.)  The most recent hospitalization was a month earlier and was for one week.  (Id. at 70.)  She had tried to kill herself.  (Id.)

On good days, she feels fine, but has racing thoughts, spends money she should not, and says things she should not.  (Id.)  She has hallucinations on these days also. (Id. at 71.)

She takes medications, but cannot remember which ones.  (Id.)  Asked if she is taking Haldol, Plaintiff replied that she is.  (Id.)  She is also taking Percocet for pain.  (Id.)  The medications make her tired.  (Id.)  She naps during the day.  (Id. at 72, 79-80.)  Thirty percent of her days are good days; the rest are bad.  (Id. at 76, 85.)

Plaintiff last smoked marijuana one month earlier.  (Id. at 72-73.)  She is not drinking.  (Id. at 73.)

Plaintiff does not do her own shopping or go out in public.  (Id. at 74.)  She last went shopping five months earlier.  (Id. at 81.)  Asked if she was able to shop for the first four years after her onset date, Plaintiff replied, "[n]ot all the time."  (Id.)  During that time, there were approximately ten times that she did not go out for at least three months each time.  (Id.)  She does some housework, e.g., she does the dishes and vacuums, and her daughter helps with the laundry, mopping, and scrubbing the bathroom.  (Id. at 75-76.)

Plaintiff goes to bed around ten o'clock at night and wakes up three to four times during the night.  (Id. at 77.)  She has nightmares about her childhood.  (Id. at 78.)  She tries to get out of bed at ten o'clock in the morning.  (Id.)

Plaintiff stopped working on July 6, 2006, because she had a breakdown.  (Id. at 80-81.)

Plaintiff visits with a sister when the sister comes to her house.  (Id. at 83.)  She does not go out to eat, belong to any organizations, or engage in any entertainment activities.  (Id.)  She can count change, but not handle a savings account.  (Id. at 83-84.)

Ms. Waddell testified without objection as a vocational expert (VE). She was asked by the ALJ to assume a hypothetical person of Plaintiff's age, education, and vocational background who could perform the physical exertional requirements of light work with additional limitations of only occasionally balancing, stooping, and climbing ramps or stairs; of never kneeling, crouching, crawling, or climbing ropes, scaffolds, or ladders; never performing work overhead; of needing to avoid exposure to such workplace hazards as dangerous moving machinery, unprotected heights, and open flames; and of never operating a motor vehicle. (Id. at 87-88.) This person also needed a controlled environment with no temperature extremes, no pulmonary irritants, no vibrations, and a moderate amount of noise. (Id. at 88.) She could understand, remember, and carry out simple instructions; make only simple work-related decisions; deal with only occasional changes in work processes and environment; have no contact with the general public; and have only incidental or superficial work-related contact with co-workers. (Id.) Ms. Waddell replied that this person could perform such jobs as a mail router, *Dictionary of Occupational Titles* (DOT) 222.587-938; price-marker, DOT 209.587-034; and routing clerk, DOT 222.687-022. (Id. at 88-89.) These three jobs had a specific vocational preparation (SVP) level of two[4] and existed in significant numbers in the state and national economies. (Id.) An inability to maintain production or performance quotas would not effect these occupations. (Id. at 89.)

_____

[4]"The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

If the acceptable noise level were reduced from moderate to quiet, only the job of price-marker would be eliminated.  (Id.)  Another job, that of textile ticketer, DOT 229.587-018, could be performed with the reduced noise level and the other limitations.  (Id. at 90.)

Each of the jobs cited have an absence tolerance of one day per month.  (Id.)

If the hypothetical person was going to be off-task for twenty percent of the time, the jobs would be precluded.  (Id. at 93.)  Ten percent of the time off-task would be tolerated.  (Id.)  If the person had to unexpectedly leave their work station six to seven times a day, the jobs would be precluded.  (Id. at 94.)  If the person had to take a short break after working thirty to forty minutes, the jobs would be precluded.  (Id. at 94-95.)  The jobs would also be precluded if the person could have no contact with co-workers.  (Id. at 95.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of her physical and mental capabilities.

When applying for DIB, Plaintiff completed a Disability Report.  (Id. at 192-201.)  She was 5 feet 6 inches tall and weighed 128 pounds.  (Id. at 192.)  Her impairments, see pages one to two, supra, limit her ability to work by causing her to be paranoid, afraid of people, want to avoid people, cry often, have suicidal thoughts, and not want to leave her house.  (Id. at 193.)  These impairments first bothered her on June 30, 2006, and prevented her from working the same day.  (Id.)  She had tried to work one day after that, but had to have people help her.  (Id.)  She stopped working on July 30, 2006, because she could not

be around people.[5]  (Id.)  She completed the twelfth grade, and had been in special education

classes.  (Id. at 199.)

Asked to describe on a Function Report what she does during the day, Plaintiff

reported that she either gets up on her own or her husband makes her.  (Id. at 202-09.)  She

drinks coffee with her husband or family.  (Id. at 202.)  Her family makes her take a shower

and clean-up.  (Id.)  She tries to do  housework, but usually goes back to her bedroom until

her husband makes her eat lunch.  (Id.)  She then goes back to bed until her family makes her

get up.  (Id.)  She cries often during the day.  (Id.)  She does not take care of anyone else.

(Id. at 203.)  Before her impairments, she played with her grandchildren, cleaned her house,

worked as a waitress, and had fun with her family.  (Id.)  She does not want to take care of

her personal needs, including eating, bathing, and getting dressed.  (Id.)  Her family makes

her do so.  (Id. at 203-04.)  She does not cook or do any household chores.  (Id. at 204.)  Her

family makes her go outside everyday, although she does not like to because she is afraid

someone will see her or she will say something to them.  (Id. at 205.)  Her doctor has told her

she should drive.  (Id.)  When she shops, a family member holds her hand.  (Id.)  The best

she can remember, she can count change.  (Id.)  She cannot handle a savings account. (Id.)

Before her impairments, she liked to sew, garden, and read.  (Id. at 206.)  She can

occasionally still sew.  (Id.)  Her impairments adversely affect her abilities to remember,

complete tasks, concentrate, follow instructions, and get along with others.  (Id. at 207.)  She

_____

[5]Plaintiff reported on another Disability Report form that she stopped working on June 6,
2006, because of her condition.  (Id. at 223.)

can walk a long way before having to stop and rest for a brief period.  (Id.)  She can pay attention for one minute, does not finish what she starts, and can not follow written or spoken instructions.  (Id.)  She does not get along well with authority figures.  (Id. at 208.)  She handles changes in routine okay, but not stress.  (Id.)  She feels that people are always talking about her and hears voices telling her she is stupid and lazy and should kill her father[6] and herself.  (Id.)  She does not wear glasses.  (Id.)

Plaintiff's sister completed a Function Report on her behalf, reporting that she stays with Plaintiff four days a week.  (Id. at 210-18.)  During the day, Plaintiff "is in her own little world most of the time."  (Id. at 210.)  She cries a lot, drinks coffee, and does not eat much.  (Id.)  She does not care for anyone else.  (Id. at 211.)  She feeds herself, but doesn't care if she bathes or dresses.  (Id.)  She takes sleeping pills, but cannot rest.  (Id.)  She does not cook, but does laundry, some cleaning, and makes her bed.  (Id. at 212.)  She needs encouragement to do these chores.  (Id.)  She goes outside perhaps twice a day, but needs to have someone by her side.  (Id. at 213.)  She shops once a week only long enough to get the things she needs.  (Id.)  She cannot handle a savings account, but might be able to count change.  (Id.) Her hobbies are smoking cigarettes, drinking coffee, and sewing "some."  (Id. at 214.)  She does these things daily.  (Id.)  She does not need to be reminded to go places, but does need someone to accompany her.  (Id.)  She does not have any problem getting along with family, friends, or neighbors.  (Id.)  Her impairments adversely affect her abilities

---

[6]The Court notes that the medical records consistently report Plaintiff's disclosure that her father died years earlier when he was struck by a car while walking.

to talk, remember, complete tasks, concentrate, follow instructions, and get along with others. (Id. at 207.) She can walk a long way before having to stop and rest. (Id.) She can not pay attention for long and gets confused. (Id. at 215.) She needs to have instructions explained over and over. (Id.) She gets along "very well" with authority figures. (Id.) She handles changes in routine well, but not stress. (Id. at 216.) She is afraid of being alone and afraid of people looking at her. (Id.) She cries all the time. (Id. at 217.)

Three years later, in October 2009, Plaintiff completed another Function Report. (Id. at 242-49.) During the day, she watches television, goes for walks, takes naps, and cleans the house. (Id. at 242.) She has no problem with personal care tasks. (Id. at 243.) Her husband reminds her to take her medications. (Id. at 244.) She prepares meals daily, this takes thirty to forty-five minutes. (Id.) She cleans and does laundry for two hours each week; she periodically stops and rests when doing so. (Id.) She goes outside everyday, either walking or driving a car. (Id. at 245.) She goes out alone. (Id.) She shops weekly for approximately twenty minutes. (Id.) She cannot count change, but can use a checkbook. (Id.) She has no hobbies or interests. (Id. at 246.) She used to enjoy being outside and reading, but now does not like to be around others and cannot concentrate on her books. (Id.) She does not spend time with others. (Id.) Her impairments adversely affect her abilities to remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (Id. at 247.) She cannot walk farther than one-half mile before having to stop and rest for thirty minutes. (Id.) She cannot pay attention for longer than ten minutes. (Id.) She follows written and spoken instructions okay. (Id.) She gets along well with authority

- 9 -

figures, but cannot handle stress or changes in routine.  (Id. at 248.)  She is afraid of being around people and speaking to them.  (Id.)  She wears glasses all the time; they were prescribed four years earlier.  (Id.)

The same month, Plaintiff's husband completed a Function Report on her behalf, reporting that Plaintiff stays around the house during the day.  (Id. at 253-60.)  She has no problem with personal care tasks.  (Id. at 254.)  She does not take care of anyone else.  (Id.)  Once a week she prepares light meals, e.g., sandwiches, soup, or salads.  (Id. at 255.)  This takes her an hour.  (Id.)  She does the laundry weekly and makes the bed and straightens up daily.  (Id.)  She goes outside every day.  (Id. at 256.)  Once every two weeks, she shops for clothes and household items for thirty minutes.  (Id.)  She can count change and use a checkbook; she cannot handle a savings account.  (Id.)  She watches television all day.  (Id. at 257.)  She talks and visits with family, but does not go anywhere on a regular basis.  (Id.)  Three times a week, she meets her sisters for coffee.  (Id.)  Mr. Mattingly agreed with Plaintiff about the abilities her impairments adversely affect.  (Id. at 258.)  She can walk a mile before having to stop and rest for five minutes.  (Id.)  She can pay attention for ten minutes; and, she does not finish what she starts.  (Id.)  Her ability to follow written instructions is good; her ability to follow spoken instructions is fair.  (Id.)  She gets along well with authority figures.  (Id.)  She handles changes in routine okay, but not stress.  (Id. at 259.)  She is afraid of being alone.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 264-71.)  Her pain, depression, and anxiety were all worse.  (Id. at 265.)

- 10 -

Also after the initial denial of Plaintiff's application, another sister answered some questions about Plaintiff.  (Id. at 272-74.)  She reported that Plaintiff is nervous, anxious, does not like to be around people, and gets upset if things are not perfect.  (Id. at 272.)  The sister can tell that Plaintiff's head is always hurting.  (Id.)  Plaintiff can walk for two blocks, stand for two hours, and sit for one hour.  (Id. at 273.)  The most she can lift with one hand is five pounds and with both hands is ten pounds.  (Id.)  She bathes every two or three days.  (Id.)  She has difficulty remembering something just told her.  (Id. at 274.)  Plaintiff's daughter also answered a questionnaire.  (Id. at 275-77.)  Her answers were similar to those of her aunt's.  (Id.)

Plaintiff's relevant medical records before the ALJ are summarized below in chronological order.  They begin with Plaintiff's visit on January 5, 2006,[7] to the emergency room at Scotland County Memorial Hospital (Scotland County) for complaints of moderate anxiety and abdominal pain that had begun two to three weeks earlier.  (Id. at 343-47, 516-21.)  After being given Toradol and a "GI cocktail," Plaintiff improved.  (Id.)  She declined admission and was discharged within two hours.  (Id. at 344.)

One week later, she had a esophagogastroduodenoscopy, which revealed mild gastritis and superficial gastric ulcers, and a colonoscopy, which was normal with the exception of colonic muscuosal edema.  (Id. at 367-70, 522-25.)

---

[7]For a summarization of Plaintiff's emergency room visits between March 2003 and December 2005, see the ALJ's decision at pages 12 to 13 of the Record.

Six months later, on June 14, Plaintiff returned to the emergency room at Scotland County for complaints of headaches, hot flashes, insomnia, and anxiety.  (Id. at 342.)  She had stopped taking prescribed injections due to her cigarette smoking and refused to quit smoking.  (Id.)

Plaintiff was taken to the Scotland County emergency room on July 7 for an anxiety attack that had begun thirty minutes earlier.  (Id. at 334-41, 532-37.)  Her husband reported that she had been fine until a family situation arose.  (Id. at 334.)  She was reported to be under a lot of stress.  (Id. at 335.)  Her dosage of Zoloft had recently been increased.  (Id.)  She was diagnosed with acute anxiety, treated with Ativan, given a prescription for tramadol, told to follow up with her primary care physician, and discharged within two hours. (Id. at 336-37.)

Plaintiff returned to the emergency room on July 17, reporting that she had not worked after July 4th and was feeling severely depressed since.  (Id. at 379-92.)  She felt isolated and paranoid.  (Id. at 379.)  She was not sleeping.  (Id.)  She had headaches every day and "'a lot'" of panic attacks.  (Id.)  She denied having hallucinations, did have suicidal ideation with a plan and intent, and was currently taking more than the prescribed doses of her medications, including Seroquel, Zoloft, Lexapro, and lorazepam.  (Id.)  She had been seeing a psychiatrist for approximately twenty years.  (Id.)  She had had two suicide attempts, one when she was in high school and one when she was in her 20s.  (Id.)  She related the history of abuse by her father.  (Id. at 379, 389.)  Her first husband beat and raped her.  (Id. at 381.)  She drank "significant amounts" of alcohol.  (Id. at 379.)  She drank four to six cans of beer a day and

- 12 -

had done so for the past seven years.  (Id.)  She smoked two packs of cigarettes a day and

drank as much caffeine as she could.  (Id. at 380.)  She had been sleeping only four hours a

day and had decreased pleasure and energy.  (Id.)  She had completed the twelfth grade.  (Id.

at 381, 389.)  Her husband was disabled; he had heart failure and was waiting for a heart

transplant.  (Id. at 381, 384, 387.)  They had been married twenty years.  (Id. at 381.)  On

examination, Plaintiff was distraught, "somewhat disheveled in appearance," and had

psychomotor retardation.  (Id.)  Her speech was normal in volume rate and tone; her thought

content was goal-directed and logical.  (Id.)  Her eye contact was fair to poor.  (Id.)  Her

affect was flat and, occasionally, tearful.  (Id.)  She was alert and oriented to time, place,

person, and situation.  (Id.)  Her insight and judgment appeared to be grossly impaired.  (Id.)

The diagnosis of Jonathan D. Cohen, D.O., was bipolar disorder depressed, severe with

psychotic features; post-traumatic stress disorder (PTSD), severe; alcohol abuse, rule out

dependence; and a Global Assessment of Functioning of 20.[8]  (Id. at 381-92.)  She was to be

admitted for inpatient psychiatric treatment.  (Id. at 383.)

   The same day, she was admitted to Hannibal Regional Hospital.  (Id. at 384-92.)  Her

GAF on admission was 31.[9]  (Id. at 392.)  After denying suicidal ideation for three days, she

_____

   [8]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text
Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's
overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and
consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734,
737 (8th Cir. 2010).  A GAF score between 11 and 20 reflects "[s]ome danger of hurting self or
others . . . OR occasionally ails to maintain minimal personal hygiene . . . OR gross impairment in
communication . . . ."  DSM-IV-TR at 34 (emphasis omitted).

   [9]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or
communication . . . OR major impairment in several areas, such as work or school, family relations,

was discharged on July 28 in a "significantly improved" condition.  (Id. at 384-85.)  Her discharge diagnoses were bipolar I disorder, depressed; panic disorder with agoraphobia; social phobia, generalized type; and PTSD, chronic.  (Id. at 385.)  Her GAF was 65.[10]  (Id. at 386.)

Five days later, on August 2, Plaintiff was admitted to Keokuk Area Hospital after going to the emergency room with complaints of depression, suicidal ideation, and hallucinations.  (Id. at 479-90.)  Also, she had been having crying spells.  (Id. at 480.)  She reported having suffered from psychiatric illnesses for the past twenty years.  (Id.)  Her symptoms had worsened during the past two weeks.  (Id.)  She denied any history of alcohol use or street drug use.  (Id. at 480, 483.)  She further reported that she had been physically and sexually abused by her father from the ages of four years to fourteen.  (Id. at 480, 481.)  She finished high school.  (Id. at 480.)  She and her husband owned a restaurant.  (Id. at 481.)  On examination, she was alert and oriented to time, place, and person.  (Id.)  She was tearful during the interview.  (Id.)  She had been hearing voices for the past few weeks, and had not heard them before.  (Id.)  She reported that she could not stop crying.  (Id.)  She appeared to be functioning at an average intelligence level and to have a fair remote and recent memory.

---

judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

[10]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis omitted).

(Id.)  Her GAF on admission was 25.[11]  (Id.)  After her medications were adjusted to the point where she was no longer having hallucinations or, with the exception of leg pain, other symptoms, she was discharged on August 7.  (Id. at 485-90.)  She was strongly encouraged to participate in psychotherapy and was referred to an agency to help her make arrangements to do so.  (Id. at 487, 489.)

On the evening of August 23, Plaintiff returned to the Scotland County emergency room with complaints of a headache she had had since noon.  (Id. at 538-43.)  She was given Phenergan and Demerol (an opioid pain reliever similar to morphine[12]and discharged.  (Id. at 540.)

The next month, Plaintiff went to the Scotland County emergency room for complaints of headaches and painful ribs after falling off a stool.  (Id. at 544-49, 553.)  X-rays of her ribs were normal.  (Id. at 553.)

On October 5, she was seen the emergency room for headaches and again on October 12 for leg and low back pain.  (Id. at 550-52, 554-57.)  The restaurant where she had last been a waitress and which was owned by her and her husband was listed as her employer.  (Id. at 557.)  The next day, she was treated at the emergency room for abdominal pain.  (Id. at 558-63.)

---

[11]A GAF score between 21 and 30 is assigned when "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ."  DSM-IV-TR at 34 (emphasis omitted).

[12]See Demerol, http://www.drugs.com/demerol.html (last visited Sept. 26, 2013).

On April 13, 2007, Plaintiff was admitted to Scotland County for abdominal pain, shortness of breath, pain in her left jaw and chest, and nausea.  (Id. at 564-68, 698.)  She smoked one to two packs of cigarettes a day and had an occasional alcoholic drink.  (Id. at 564.)  Chest x-rays revealed COPD with calcified granuloma in her left lower lobe.  (Id. at 698.)  She was treated with medications and released the next day.  (Id. at 566.)

Two days later, she returned to the emergency room with complaints of diarrhea and abdominal pain that had begun three days earlier.  (Id. at 569-75, 699.)  X-rays revealed mild degenerative changes in her lower lumbar spine.  (Id. at 575, 699.)

Plaintiff saw her primary care physician, Jeffrey Davis, D.O., on April 17.  (Id. at 700.)  Dr. Davis reported that Plaintiff had lost her medical insurance and had not taken any medications until four to five months earlier when she had a nervous breakdown, was admitted to a psychiatric hospital, and diagnosed with bipolar disorder.  (Id.)  Since then, "[s]he has been on psychotropic medications with close psychiatric follow-up."  (Id.)  She had recently quit smoking and had lost weight.  (Id.)  She had "regular alcohol intake."  (Id.)  She had been taking her Percocet, but not Prilosec as the pharmacy was out of it.  (Id.)  On examination, she was in no acute distress, but was tearful and had cramping pain.  (Id.)  She was prescribed various medications for her abdominal distress and told not to drink alcohol.  (Id.)

The next day, Plaintiff went to the Scotland County emergency room with reports of having hallucinations of bugs on wall and thoughts of hurting others.  (Id. at 576-81.)  She

was described as a heavy drinker who had stopped drinking three days earlier.  (Id. at 576, 578.)  She was treated with medication and discharged.  (Id. at 579.)

The next day, Plaintiff was seen at the emergency room at Keokuk Area Hospital for reports of paranoia and visual hallucinations that had begun one week earlier.  (Id. at 476-78.) She was transferred to Hannibal Regional Hospital.  (Id. at 478, 929-40.)  When there, she reported that she had been drinking a great deal, but had stopped a few days earlier because she started to see men with large heads.  (Id. at 929.)  She had not been eating well and had lost thirty pounds in several weeks.  (Id.)  She still thought she looked fat.  (Id.)  Her medications included Abilify, Topamax, Effexor, Wellbutrin, and lorazepam.  (Id. at 930.) She had completed high school.  (Id. at 931.)  She was placed on a detoxification protocol. (Id. at 937.)  The next day, Plaintiff denied having seen bugs or men, explaining that she had only seen red hearts.  (Id. at 936.)  She complained about not being able to smoke.  (Id.)  She was described as "belligerent and demanding."  (Id.)  On April 22, she was discharged against medical advice.  (Id. at 927-28, 937.)  She felt that alcohol was not a problem for her.  (Id. at 937, 940.)  She explained that she was not having any hallucinations and that she had had them because she had been given a lot of medications at an emergency room when she was being treated for stomach pains.  (Id. at 927.)  Because of her confusion, she had then taken too many of the pills she was given.  (Id. at 927.)  She was planning on not drinking when she got home.  (Id.)

On May 8, Plaintiff saw Dr. Davis about abdominal pain and constipation that had begun earlier when she left for a trip to New York.  (Id. at 701-03.)  X-rays showed a

"[p]robable very mild adynamic ileus."  (Id. at 703.)  Dr. Davis prescribed a  suppository.
(Id. at 702.)

The next day, Plaintiff went to the Scotland County emergency room for abdominal
pain that had begun five to six days earlier.  (Id. at 582-97.)  She was treated with
medications and discharged.  (Id. at 586.)

On July 28, Plaintiff returned to the Scotland County emergency room.  (Id. at 588-95,
705-07.)  She had taken a handful of flurazepam (prescribed for the treatment of insomnia),
woken up her sister up and told her she had taken too many pills, and had been brought to
emergency room by her husband.  She reported that she did not care if the pills killed her but
she had not intended to commit suicide and had only wanted to fall asleep to escape from
depression and frustration.  (Id. at 588, 590.)  She had had five to six mixed drinks that
evening, as she usually did every evening.  (Id. at 588.)  She sees a psychiatrist, Dr. Gerald
Osborn.  (Id.)  She had stopped smoking four to five months earlier.  (Id.)  On examination,
she had a depressed and tearful affect and suicidal ideation without any intent.  (Id. at 589.)
Chest x-rays were negative for active or acute pulmonary disease.  (Id. at 705-07.)  She was
admitted to intensive care and continued on her medications of Abilify, Topamax, and
Effexor.  (Id.)

The next day, she was transferred to Hannibal Regional Hospital.  (Id. at 590, 1036-
48.)  Her chief complaint then was that she had been drinking and felt suicidal.  (Id. at 1036,
1040.)  She was upset because her husband would not allow her to drink alcohol any more.
(Id.)  She "ha[d] been drinking alcohol heavily for the last several years, but for the last

- 18 -

several months drinking almost every day." (Id.)  She was working at the family-owned restaurant approximately three days a week.  (Id. at 1047.)  On those days, she cannot wait to leave work and go home and get drunk.  (Id.)  She drinks whiskey straight.  (Id. at 1048.) During a session on July 31, she informed the psychiatrist that she had also been abusing Percocet pills, which had been given her by the doctors at Scotland County.  (Id. at 1044.) She was placed on a detoxification protocol.  (Id. at 1036, 1038, 1043, 1045.)  She was discharged the next day.  Her discharge diagnoses included alcohol dependence, physiological withdrawal symptoms; bipolar mood disorder type one by history, current depressed; PTSD; social phobia; and generalized anxiety disorder.  (Id. at 1037.)  Her GAF was 50.[13]  (Id.)  She agreed on discharge to go to drug and alcohol treatment by noon the next day.  (Id. at 1045, 1046.)

The next medical record, however, is of her September 27 visit to the Scotland County emergency room for headaches.  (Id. at 596-601.)

When seeing Plaintiff on October 3, Dr. Davis noted that she was taking Campral for treatment of alcoholism and had been clean and sober for approximately six weeks.  (Id. at 709.)

Plaintiff returned to the Scotland County emergency room on October 23 for treatment of her headaches.  (Id. at 602-07.)  As with previous visits, Plaintiff was given Demerol.  (Id. at 606.)

---

[13]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

On January 19, 2008, Plaintiff was admitted to Scotland County with complaints of chest pain.  (Id. at 608-13.)  A chest x-ray was clear.  (Id. at 611.)  An electrocardiogram (EKG) showed a normal sinus rhythm without acute changes.  (Id.)  She reported that she had not been seeing a counselor or a psychiatrist.  (Id. at 612.)  On discharge four days later, her diagnoses included uncontrolled anxiety and bipolar disorder, gastroesophageal reflux disease (GERD), hypertension, and alcoholism.  (Id. at 608.)  She smoked one pack of cigarettes a day, and had for thirty years.  (Id. at 610.)  She reported that she had stopped drinking seven months earlier.  (Id.)

Plaintiff was admitted to the University of Iowa Hospital on January 30 for clipping of an aneurysm.  (Id. at 942-72, 974-83.)  During her hospitalization, she received "significant amounts of narcotic medications."  (Id. at 977.)  She was discharged on February 6.

On February 22, Plaintiff was treated at the Scotland County emergency room with Demerol for her headaches.  (Id. at 614-18.)

Plaintiff returned to the University of Iowa Hospital on February 26, reporting that she had been having difficulties with persistent and worsening headaches since her discharge.  (Id. at 984-85.)  She was given a prescription for Percocet.  (Id. at 984.)  The surgeon was hopeful that her headaches would improve with the passage of time.  (Id.)  On March 11, the surgeon sent her, at her request, another prescription for Percocet but advised her to wean herself off the "potent narcotic."  (Id. at 986.)

Chest x-rays taken on March 31 revealed evidence of mild COPD and old granulomatous disease.  (Id. at 719, 825.)

On August 30, Plaintiff was treated at the Scotland County emergency room with Demerol for her headaches.  (Id. at 622-28, 722.)  A CT scan of her head showed status-post right temporal craniotomy and aneurysm clip, but no evidence of acute intracranial hemorrhage.  (Id. at 722.)

The next day, Plaintiff was again admitted to the University of Iowa Hospital.  (Id. at 986-1021.)  It was noted that she had been on Percocet for the past three months and had run out of the medication the week before.  (Id. at 988.)  She told a physician's assistant that she had been taking two tablets of Percocet every four hours until she ran out.  (Id. at 992, 993.)  Three days later, a consulting physician noted that Plaintiff was oriented to time, place, and person; had normal speech, language, attention span, and concentration; and had intact remote and recent memory.  (Id. at 1019.)  Her reflexes, motor strength and tone, and coordination were all normal.  (Id. at 1020.)  She was discharged with the suggestion that she follow-up with her primary care physician for migraine prophylaxis, but she explained that she did not have a primary care physician.  (Id. at 1016.)

Plaintiff was seen again at the Scotland County emergency room for headaches on September 27.  (Id. at 629-35, 723.)

Chest x-rays taken on October 4 revealed COPD and no active disease.  (Id. at 724.)

Plaintiff saw Dr. Davis on October 22 for refills of her medications.  (Id. at 725-26.)

On November 3, Plaintiff went to the Scotland County emergency room for treatment of a headache that had begun when she woke up.  (Id. at 641-45.)

On January 2, 2009, Plaintiff returned to that emergency room with complaints of diarrhea and abdominal pain.  (Id. at 646-51, 728-29.)  Abdominal x-rays and a pelvic CT scan were normal.  (Id. at 728-29.)  CT scans of her of pelvis and abdomen done two days later revealed a right renal cyst and sigmoid diverticulosis without definite evidence of acute diverticulitis.  (Id. at 731-36.)

On April 20, Plaintiff went to the emergency room at Keokuk Area Hospital with complaints of headaches.  (Id. at 470-75.)  A CT scan of her head revealed the right middle cerebral artery territory aneurysmal clip but no evidence of any acute abnormality.  (Id. at 473-74.)  Plaintiff was given Demerol and Percocet to be taken every six hours and discharged with two hours.  (Id. at 475.)

A CT scan of her head taken in June was normal.  (Id. at 740.)

Shortly thereafter, she was admitted to Scotland County after going to the emergency room with feelings of suicide, but no plan or intent.  (Id. at 652-55.)  She reported occasional alcohol use, a history of alcoholism, and a cessation of smoking four weeks earlier.  (Id. at 652.)  Two days later, on June 16, she was transferred to Blessing Hospital and admitted.  (Id. at 496-97, 504-15, 654-55.)  When there, Plaintiff reported that she had a history of an aneurysm and bipolar disorder.  (Id. at 504.)  Since the aneurysm, she had not had any headaches, but did have a few migraines.  (Id.)  Three days earlier, she had a sudden onset of a severe headache that was sharp, continuous, and a nine on a ten-point scale.  (Id.)  She

did not have any neck pain, sensitivity to noise, nausea, or vomiting.  (Id.)  She felt okay when lying down, but was lightheaded when up.  (Id.)  Because of the headache, she felt like hurting herself.  (Id.)  She had quit smoking one month earlier.  (Id.)  She did not drink or use illegal drugs.  (Id.)  CT scans of her brain revealed an aneurysm clip, but no intraparenchymal hemorrhagic lesions.  (Id. at 496-97.)  There was an area of low density in the lateral aspect of the right anterior cranial fossa.  (Id.)  It was undetermined whether this area represented an area of encephalomalacia or chronic subdural hematoma or hygroma.  (Id.)  Linda Johnson, M.D., performed a consultative examination, finding Plaintiff to be alert and oriented with an initially normal affect followed by "some tearfulness."  (Id. at 507-08.)  Plaintiff was given trigger point injections over the pain area and reported that the she felt a little better.  (Id. at 509-10.)

During her hospitalization, Plaintiff was also seen by Lanny Stiles, D.O., for a psychological consultation.  (Id. at 510-12.)  She reported that she had been taking Chantix prior to stopping smoking, but had stopped taking it when she had stopped smoking six weeks earlier.  (Id. at 510.)  She had then gained weight.  (Id.)  Her sisters, who work as waitresses in the restaurant owned by Plaintiff and her husband, made fun of her weight.  (Id.)  Her bipolar disorder had been managed well by her primary care physician for the past four or five years.  (Id.)  She requested that she be restarted on Abilify, which she described as working "fairly well" to control her symptoms.  (Id.)  The Abilify had been stopped when she was hospitalized earlier.  (Id. at 510-11.)  On examination, her eye contact and memory were good; her thought processing was linear and intact; her intellectual capacity was good..  (Id.

- 23 -

at 511.)  She was oriented to time, place, person, and situation, and was bright, alert, and cooperative.  (Id.)  Her insight and judgment were fair to poor.  (Id.)  She explained that she had made the comment about killing herself because of frustration with her pain.  (Id.)  She did not have any active suicidal plan.  (Id.)  Dr. Stiles recommended she "restart" outpatient psychiatric medical management until her mood was stabilized.  (Id.)

Plaintiff's diagnoses when she was discharged on June 18 were intractable cephalgia; history of brain aneurysm, status post clipping; suicidal ideations; bipolar disorder; and volume depletion.  (Id. at 513-15.)  Her medications included Abilify, Lamictal, Effexor, and carbamazepine.  (Id. at 514.)  She was to follow up with her primary care physician and with an outpatient psychiatry provider.  (Id.)

Two days later, Plaintiff went to the Scotland County emergency room to request help.  (Id. at 656-60.)  The next day, she was admitted to the Audrain Medical Center and discharged on June 25.  (Id. at 431-65.)  When hospitalized, she reported that she had started on Chantix five to six weeks earlier and had become more depressed.  (Id. at 431.)  She was having auditory and visual hallucinations.  (Id.)  She had planned to overdose on her medications and continued to feel suicidal at the time of admission.  (Id.)  She had not been sleeping well.  (Id.)  She was unhappy at the restaurant where she worked.  (Id.)  She had been married twice, neither husband was abusive.  (Id. at 449.)  She and her current husband, her second, got along fine.  (Id.)  Her medications included Effexor, Lamictal, Abilify, and carbamazepine.  (Id. at 450.)  They were originally prescribed by a psychotherapist and had been renewed for ten years by the primary care physician that she sees several times a year.

- 24 -

(Id. at 450.)  She quit smoking five weeks earlier by using Chantix.  (Id. at 451.)  She had no physical complaints, including no arthritis and no back pain.  (Id.)  She and her husband owned a restaurant, but she did not want to be a waitress.  (Id. at 462.)  The admission record refers to Plaintiff never having a problem with drug or alcohol abuse.  (Id. at 450.)  The discharge summary refers to her having a history of drinking a lot every day.  (Id. at 432.)  She took ten to fourteen pain pills every day.  (Id. at 432.)  She drank a lot of caffeine.  (Id.)  She had attempted suicide four years earlier.  (Id.)  On admission, her recent and remote memory were intact.  (Id. at 439.)  Her medications were adjusted during her hospitalization and "her mood gradually stabilized."  (Id. at 433-34.)  She denied further hallucinations or suicidal ideation.  (Id. at 434.)  She was discharged on June 25 with a diagnosis of bipolar affective disorder mixed with psychotic features; history of polysubstance dependence in partial remission; and history of panic attacks.  (Id.)  Her GAF, which had been 35 on admission, was 60 on discharge.  (Id. at 435, 440.)  She was to follow up with a counselor.  (Id. at 435.)

Five days later, on June 30, Plaintiff returned to the Scotland County emergency room after having suicidal thoughts, but no plan, for three weeks.  (Id. at 661-67.)  She reported a change in her medications.  (Id. at 666.)  She was then voluntarily admitted to Audrain Medical Center.  (Id. at 393-430.)  "Her three most stressful things are her work, her in-laws and getting along with her husband."  (Id. at 393.)  She was feeling paranoid, but was sleeping okay.  (Id.)  Alcohol was no longer a problem – she had been in rehabilitation the year before and last had a drink two weeks ago.  (Id. at 394.)  She did abuse pain pills.  (Id.)

The longest period she had been clean was five months.  (Id.)  She had had one suicide attempt, and that was four years earlier when she overdosed on pills.  (Id.)  She had auditory hallucinations, but her memory was "grossly intact," her intelligence was normal, her motivation was "okay," and her insight and judgment were limited.  (Id.)  Her medications were adjusted in type and dosage until, on July 21, she reported that her hallucinations were gone.  (Id. at 396.)  Her diagnoses on discharge that day were bipolar affective disorder currently depressed with polysubstance dependence.  (Id. at 396-97.)  Her GAF had been 35 on admission and was 60 on discharge.  (Id. at 397, 403.)  She was to follow up with a counselor in two days and a therapist the next day.  (Id. at 397, 425.)

Eight days later, Plaintiff returned to the emergency room with reports of hallucinations.  (Id. at 668-72.)  Two days later, on July 31, she went to Keokuk Area Hospital with complaints of mild hallucinations.  (Id. at 466-69.)  It was noted that she had recently been released from the hospital for the same problem.  (Id. at 467.)  Plaintiff was given Haldol and discharged with instructions to see a psychiatrist on Monday.  (Id. at 468, 469.)

Plaintiff saw Reghnald Westhoff, A.P.R.N.,[14] with Mark Twain Behavioral Health the next day.  (Id. at 750.)  She reported that she had begun hallucinating again before she left the hospital but the hallucinations had since significantly worsened.  (Id.)  She was hallucinating, seeing rats and spiders, hearing voices, and feeling bugs crawling on her.  (Id.)  Her suicidal thoughts had stopped before she left the hospital.  (Id.)  Her current medications

_____

[14]Advanced Practice Registered Nurse.

included Tegretol (carbamazepine), Lamictal, Geodon, Loxitane, trazodone, Effexor, and Ambien.  (Id.)  Her current GAF was 35.  (Id.)  After speaking with a Dr. Andrew, Mr. Westhoff discontinued the Loxitane, started to wean Plaintiff off the Effexor, added Invega, and increased the dosage of Geodon.  (Id.)  He noted that Plaintiff had not been taking her morning dosage of Geodon.  (Id.)

Plaintiff again saw Mr. Westhoff on August 5.  (Id. at 748.)  She reported that her anxiety was not better.  (Id.)  She was no longer seeing rats, but was seeing spiders.  (Id.)  She was no longer hearing voices, but was hearing a radio.  (Id.)  She was preparing for a yard sale.  (Id.)  Her appetite was good; her sleep was fair.  (Id.)  She denied any suicidal or homicidal ideation.  (Id.)  Her current medications were Invega, Tegretol, Ambien, Effexor, Geodon, and trazodone.  (Id.)  Her current GAF was 40.  (Id.)  Her dosage of Effexor was decreased and the timing of her dosages of Tegretol and Invega was changed.  (Id.)  She was to return in one week.  (Id.)

The next day, she telephoned Mr. Westhoff to report that her hallucinations had returned and her psychosis was worse.  (Id. at 749.)  She was to increase the dosage of Invega and go to the emergency room if necessary.  (Id.)

That same day, Plaintiff did go to the emergency room, reporting that she was hearing voices.  (Id. at 673-77.)  She was transferred to Blessing Hospital and admitted.  (Id. at 499-503, 676.)  On admission, she reported that she wanted to try different medications.  (Id. at 499-503.)  During the course of her two-day stay, her psychopharmacotherapy was revised.  (Id. at 502.)  Although she remained anxious and fearful during her stay, her hallucinations

stopped.  (Id.)  Her GAF on discharge was 50.  (Id.)  Her discharge diagnoses were schizophrenia, chronic undifferentiated type and personality trait disturbance, borderline type.  (Id.)  Her medications included clozapine and trazodone.  (Id.)

Plaintiff returned on August 15 to the Scotland County emergency room, again reporting that she was hearing voices.  (Id. at 678-82, 741.)  A CT scan of her brain was normal with the exception of showing the previous aneurysm repair.  (Id. at 741.)

Plaintiff was seen at the emergency room on September 5 for low back and stomach pain.  (Id. at 683-87, 829-33.)

On September 9, Plaintiff reported to Mr. Westhoff that she had only been sleeping two hours a night.  (Id. at 745.)  She had mild paranoia.  (Id.)  She did not have any suicidal thoughts.  (Id.)  Her current medications were Abilify, trazodone, Lithium, and Ambien.  (Id.)  Her diagnoses were bipolar I disorder, recurrent, moderate; PTSD; and history of polysubstance abuse in remission.  (Id.)  Her GAF was 50.  (Id.)  She was to return in two weeks.  (Id.)

Plaintiff returned three weeks later, on September 30.  (Id. at 744.)  She reported having a lot of stress at home and feeling angry and sarcastic.  (Id.)  She was not drinking or using drugs.  (Id.)  She did not have any suicidal or homicidal thoughts.  (Id.)  Her GAF had increased to 52; her evening dosage of Lithium was doubled.  (Id.)

On October 20, Plaintiff went to the emergency room at Northeast Regional Center with reports of wanting to take all her pills.  (Id. at 751-54.)  She was then admitted to Hannibal Regional Hospital for in-patient psychiatric treatment.  (Id. at 779-87.)  She was

- 28 -

discharged on November 2 in "significantly improved" condition.  (<u>Id.</u> at 780.)  At discharge, she was alert and oriented to person, place, time, and situation; was pleasant and cooperative; and had normal speech, logical thought, and adequate insight and judgment.  (<u>Id.</u>)  Her medications on discharge were carbatrol, Wellbutrin, Lexapro, trazodone, Haldol, and Klonopin.  (<u>Id.</u> at 781.)  Her GAF, which had been 21 on admission, was 65.  (<u>Id.</u> at 781, 787.)

Four days later, Plaintiff was again admitted to Hannibal Regional Hospital.  (<u>Id.</u> at 758-78.)  On admission, it was noted that Plaintiff did not use tobacco or alcohol or drugs.  (<u>Id.</u> at 769.)  She tested positive, however, for cannabinoids.  (<u>Id.</u> at 773.)  She explained that she and her sister had smoked marijuana only once.  (<u>Id.</u>)  She denied having any headaches.  (<u>Id.</u>)  She was restarted on medications, with the exception of the Haldol being changed to Navane, at which time Plaintiff's hallucinations stopped.  (<u>Id.</u> at 758.)  At discharge on November 14, her GAF was 65.  (<u>Id.</u> at 762.)

On November 30, Plaintiff was referred by Dr. Davis's office to the Scotland County emergency room for her complaints of depression and suicidal thought.  (<u>Id.</u> at 834-39.)  She was described as being in acute distress, alert, neat, calm, independent in her activities of daily living, and oriented to time, place, and person.  (<u>Id.</u> at 834.)

On March 5, 2010, Plaintiff returned to the emergency room with complaints of headaches.  (<u>Id.</u> at 845-47.)  She returned five days later for the same complaints.  (<u>Id.</u> at 850-52.)

On March 20, a Saturday, Plaintiff went to the emergency room with reports of feeling snakes and spiders crawling over her.  (Id. at 855-61.)  She denied any suicidal ideation.  (Id. at 856.)  She had a history of alcohol abuse, but her husband reported that she now only drank a few beers on the weekends.  (Id. at 855.)  She had had beers that evening, had bloodshot eyes, and smelled of alcohol.  (Id. at 855, 856.)

Plaintiff returned to the Scotland County emergency room on March 27 for depression that had begun two days earlier.  (Id. at 862-66.)  She reported that she wanted to go to sleep and not wake up.  (Id. at 862.)  The next day, she was transferred to St. Francis Hospital and voluntarily admitted.  (Id. at 806-19, 864-65.)  Plaintiff attributed her lack of follow-up psychiatric care to living in a rural area.  (Id. at 808.)  She was under a lot of stress because she was taking care of her husband, who had been waiting ten years for a heart transplant, and was financially helping her two adult children.  (Id. at 808, 816.)  She had had "severe alcoholism" until being in a court-ordered rehabilitation program and had not drank since.[15] (Id. at 809.)  She reported that she routinely went to the emergency room with complaints of tension headaches that would respond only to Demerol.  (Id. at 808-09.)  On admission, her diagnoses were schizophrenia, undifferentiated type by history; major depressive disorder, severe with suicidal thought and plan; and alcohol dependence in remission.  (Id. at 813.)  During her hospital stay, her medications were adjusted.  (Id. at 818.)  On discharge on

---

[15]The Court notes that Plaintiff stated on admission that she occasionally drank alcohol.

March 31, her diagnoses were major depressive disorder, with psychotic features, alcohol dependence in remission.  (<u>Id.</u> at 809.)  Her GAF was 75.[16]  (<u>Id.</u>)

Plaintiff was seen on May 13 at the Scotland County emergency room for headaches, and was treated with Demerol.  (<u>Id.</u> at 872-78.)  She was seen again on May 21 and on May 23 for the same complaint, and received the same treatment.  (<u>Id.</u> at 879-86.)  On May 25, the provider noted that he or she did not want to treat Plaintiff with Demerol due to concerns about a chronic narcotic headache.  (<u>Id.</u> at 889-91.)  Plaintiff returned, and was treated, the next day for headaches.  (<u>Id.</u> at 892-95.)  On June 2, Plaintiff was treated at the Scotland County emergency room with Demerol for her headache.  (<u>Id.</u> at 896-97. )

Plaintiff returned on June 17 to the emergency room with reports of seeing bugs crawling around the room.  (<u>Id.</u> at 898-901.)  The hallucinations had begun nine hours earlier.  (<u>Id.</u> at 899.)  She was given two dosages of Haldol.  (<u>Id.</u> at 901.)  Within two hours, Plaintiff reported feeling much better and requested that she be discharged rather than transferred.  (<u>Id.</u> at 899.)  Plaintiff was discharged with instructions to see her psychiatrist in the morning.  (<u>Id.</u> at 901.)

On July 13, Plaintiff returned to the emergency room with renewed hallucinations that had begun seven days earlier of seeing things crawling on her.  (<u>Id.</u> at 902-05.)  She wanted Haldol.  (<u>Id.</u> at 902.)  Her anxiety was described as controlled.  (<u>Id.</u>)  Within two hours, she reported feeling better and not being anxious.  (<u>Id.</u> at 903.)  She was discharged with

---

[16]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ."  <u>DSM-IV-TR</u> at 34.

instructions to follow up with her psychiatrist in two days.  (Id. at 904.)  It was noted that she had an appointment for the follow-up.  (Id.)

Plaintiff returned to the Scotland County emergency room seven days later, reporting that she was sad and suicidal.  (Id. at 906-10.)  She had a flat affect and alcohol in her urine.  (Id. at 906, 909.)  She was transferred to Blessing Hospital for in-patient psychiatric care.  (Id. at 910.)  When there, Plaintiff reported that she had finished the twelfth grade and denied drug or alcohol abuse.  (Id. at 1030-35.)  On examination, her mood was depressed; her affect was constricted; and her thought content was positive for feelings of hopelessness, helplessness, and worthlessness.  (Id. at 1032.)  She had thoughts of suicide, but no plan.  (Id.)  She had auditory hallucinations telling her to hurt herself, but no visual hallucinations.  (Id.)  Her insight, judgment, and impulse control were poor.  (Id.)  Her attention and concentration were impaired.  (Id.)  During her five-day hospitalization, her depression "improved significantly" and her suicidal thoughts "completely disappeared."  (Id. at 1034.)  At times, she would easily yell and scream.  (Id.)  She requested that she be discharged on July 26.  (Id.)  Her diagnoses were schizoaffective disorder, depressive type, and borderline personality disorder.  (Id.)  Her GAF was 50.  (Id.)

The ALJ also had before him assessments of Plaintiff's physical and mental residual functional capacities, both completed in February 2010.

A Physical Residual Functional Capacity Assessment form was completed by Evie Knapp, a single decisionmaker.[17]  (Id. at 99-104.)  Plaintiff's primary diagnosis was status-post aneurysm; her secondary diagnosis was headaches.  (Id. at 99.)  These impairments did not result in any exertional, manipulative, visual, or communicative limitations.  (Id. at 100-02.)  They did result in environmental limitations of needing to avoid concentrated exposure to extreme heat, noise, vibration, and pulmonary irritants.  (Id. at 102.)  She should avoid all exposure to workplace hazards.  (Id.)

Michael Stacy, Ph.D., a non-examining medical consultant, assessed Plaintiff's mental functioning abilities and limitations.  (Id. at 789-801.)  On a Psychiatric Review Technique form (PRTF), Dr. Stacy assessed Plaintiff as having an affective disorder, i.e., bipolar disorder; anxiety-related disorders, i.e., PTSD, panic disorder, and social phobia; and substance addiction disorders.  (Id. at 789, 792, 793, 795.)  These disorders resulted in mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  (Id. at 797.)  They also caused one or two episodes of decompensation of extended duration.  (Id.)  In his notes, Dr. Stacy cited the records of Plaintiff's various hospitalizations for in-patient psychiatric treatment.  (Id. at 799-800.)

On a Mental Residual Functional Capacity Assessment, Dr. Stacy assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and

---

[17]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 802.)  In the area of sustained concentration and persistence, she was moderately limited in four of eight listed abilities, i.e., carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or proximity to others without being distracted by them; and completing a normal workday and workweek without interruptions from psychologically-based symptoms. (Id. at 802-03.)  She was not significantly limited in the remaining four abilities. (Id.)  In the area of social interaction, Plaintiff was moderately limited in one of the five abilities, i.e., interacting appropriately with the general public, and was not significantly limited in the remaining four. (Id. at 803.)  In the area of adaptation, Plaintiff was moderately limited in two abilities, i.e., responding appropriately to changes in the work setting and traveling in unfamiliar places or using public transportation. (Id.)  She was not significantly in the remaining two abilities. (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirements of the Act through September 30, 2011, and had not engaged in substantial gainful activity after her alleged disability onset date of July 6, 2006. (Id. at 12.)  He next found that she had severe impairments of "status post cerebral aneurysm with clipping in February 2008; headaches, migraine/tension vascular/sinus; abdominal pain/gastritis/gastric ulcers/[IBS]; bipolar disorder; [PTSD]; panic disorder; social phobia; and history of polysubstance dependence." (Id.)  In the next sixteen pages, the ALJ summarized in detail Plaintiff's medical records

- 34 -

beginning with those of an emergency room visit in March 2003 for knee pain, see note 7, supra, to those of July 2010.  (Id. at 12-28.)  He also referenced the assessments of Dr. Stacy and of Ms. Knapp.  (Id. at 28.)

The ALJ then concluded that Plaintiff did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity, including Listings 12.04 (affective disorder), 12.06 (anxiety related disorders), and 12.09 (substance addiction disorders).  (Id. at 28.)  Specifically, Plaintiff had mild restrictions in activities of daily living and moderate difficulties in social functioning and in concentration, persistence, or pace.  (Id. at 29.)  She had experienced one to two episodes of decompensation, each of extended duration.  (Id.)  The ALJ noted that "[r]epeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least two weeks."  (Id.)

With her restrictions and difficulties, Plaintiff had the residual functional capacity (RFC) to perform light work except she was (1) limited to only occasional stooping, balancing, and climbing ramps and stairs; (2) precluded from kneeling, crouching, crawling, and climbing ladders, ropes, or scaffolds; (3) precluded from performing overhead work, being exposed to workplace hazards, and operating a motor vehicle; (4) to avoid exposure to temperatures 80E or greater and to 65E or less; and (5) to avoid exposure to vibration pulmonary irritants, vibration, and noise levels greater than "quiet" as defined by the DOT. (Id.)  She was able (a) to understand, remember, and carry out simple instructions and make simple work-related decisions and (b) deal with only occasional changes in work processes

- 35 -

and work environment.  (Id.)  She was not to (i) have contact with the general public; (ii) be required to maintain strict production or performance quotas; and (iii) have more than incidental, superficial work-related contact with co-workers.  (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated her credibility.  In his five-page supporting explanation, the ALJ noted at least ten inconsistencies.  (Id. at 30-34.)  These included (1) Plaintiff's testimony that she only completed the eleventh grade and her reports that she completed the twelfth grade; (2) her testimony that she could only sit for a short time due to breaking her pelvis when she was younger and her responses (a) on the August 2006 Function Report that she could walk a long way and that her impairments did not affect her abilities to lift, bend, squat, sit, kneel, or walk and (b) on the October 2009 Function Report that she could walk one-half hour; (3) her report on the 2006 Function Report that her impairments adversely affected her abilities to remember, complete tasks, understand, and follow instructions and her and her husband's reports that she could follow written and spoken instructions okay; (4) her report that she needed to be reminded to go to the doctor's office[18] but did not need someone to accompany her; (5) her complaints of shortness of breath affecting her abilities to walk and do housework, and (a) the objective medical evidence showing only mild COPD, (b) her continuing to smoke regardless of health care providers' instructions to stop, and (c) her report that she can walk half a mile before having to stop and rest; (6) her explanation when testing positive for cannabinoids that she had smoked

_____

[18]The Court notes that the ALJ later referenced Plaintiff's husband's report that Plaintiff does not need to be reminded to go places.

marijuana once with her sister and (a) her testimony that she had last smoked marijuana two months before the hearing, (b) her consistent denial that she used drugs or alcohol, and (c) her abuse of pain pills; (7) her testimony that she does not drive or go out in public and her and her husband's reports that she drives, shops alone, goes outside daily, and meets her sister for coffee three times a week[19]; (8) her and her husband's report that she can count change and use a checkbook but cannot handle a savings account; (9) her testimony that she only sees her sisters when they visit her and her husband's report that she and her sisters meet three times a week for coffee; and (10) her testimony that she only does the dishes and vacuums and her and her husband's reports that she does the household chores, cleans, and prepares her own meals. (Id.)

In the next six pages of his decision, the ALJ detailed why Plaintiff's fibromyalgia (diagnosed once in 2008 by Dr. Davis and never referred to again), headaches, abdominal pain, and knee, leg, wrist, foot, and back pain were either not severe or not of listing-level severity. (Id. at 34-39.)

Addressing Plaintiff's psychological impairments, the ALJ evaluated the records of such, see id. at 39-42, and found himself "inclined to agree with Dr. Stacy that there is insufficient medical and functional information to assess her impairment from her alleged onset of disability until June 2009, inasmuch as [Plaintiff] apparently had symptoms significant enough to seek treatment only in July and August of 2006 and then more than

---

[19]The Court notes that there was also evidence that Plaintiff had traveled to New York and had held yard sale, but requiring extensive contact with the public.

seven months later in April of 2007, and then June of 2007, with a more than two year hiatus thereafter, until June of 2009." (Id. at 42.)  After June 2009, Plaintiff had had at least six more inpatient admissions and "multiple diagnoses." (Id.)  Her diagnoses and presentations were inconsistent. (Id.)  According to Dr. Stacy, her hallucinations were atypical. (Id.)  Also, Plaintiff had not regularly followed up with treatment, another factor detracting from her credibility. (Id.)  And, she responds well to treatment. (Id.)

The ALJ next discussed the various GAFs that had been assigned to Plaintiff, noting that each GAF range has two components: (1) symptom severity and (2) functional capacity. (Id. at 42-43.)  If either component falls within the range, the GAF rating reflects the worst of the two. (Id. at 43.)  When summarizing the medical evidence, the ALJ had noted each GAF rating assigned Plaintiff, but declined to treat any one score as dispositive. (Id.)

The ALJ then evaluated the assessment of Dr. Stacy, noting that he was a non-examining consultant. (Id. at 43-45.)  He found that assessment to be supported by the record, but, giving Plaintiff the benefit of the doubt, restricted her more than did Dr. Stacy in terms of her ability to follow simple instructions, make simple work-related decisions, have contact with others, and maintain production quotas. (Id. at 44, 45.)

With Plaintiff's RFC, she was not able to perform her past relevant work. (Id. at 45.)  With her age, limited education, and RFC, she was able to perform jobs that exist in significant numbers in the state and national economies. (Id. at 45-47.)   She was not, therefore, disabled within the meaning of the Act. (Id. at 47.)

## **Legal Standards**

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; **Hurd** , 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments

which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires that the ALJ

consider "[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines "'whether a claimant's impairments keep her from doing past relevant work.'" **Wagner**, 499 F.3d at 853 (quoting Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996)).  If "the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to her past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true

and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789).

**Discussion**

Plaintiff argues that the ALJ erred (1) by not finding that her mental impairments were of listing-level severity because she had more than one to two episodes of decompensation; (2) when evaluating her credibility; and (3) by relying on Dr. Stacy's opinion when assessing her RFC.  The Commissioner disagrees.

To meet the criteria of Listing 12.04, a claimant must satisfy the requirements of A and B or of C.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04.  To meet the criteria of Listing 12.06, a claimant must satisfy the requirements of A and B or of A and C.[20]  Id. § 12.06.  Plaintiff focuses her argument under either Listing on the B criteria; therefore, the Court will similarly focus its discussion.

Regardless whether Listing 12.04 or 12.06 is at issue, the B criteria for each includes that the disorder results in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

Id. at §§ 12.04, 12.06.  Episodes of decompensation are described in the regulations as:

---

[20]Listing 12.09, cited by Plaintiff in her brief and not otherwise discussed, is satisfied if the criteria in one of the paragraphs from A to I is satisfied.  In turn, paragraph B is satisfied if the criteria for Listing 12.04 is met; paragraph C is satisfied if the criteria for Listing 12.06 is met.  Plaintiff does not suggest that one of the other paragraphs, e.g., A for organic mental disorders or G for gastritis, applies.  Thus, the discussion above about Listings 12.04 and 12.06 applies to Listing 12.09.

exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning . . . .  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(C)(4).  The necessary frequency is

three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.  If [the claimant] ha[s] experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the ALJ] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

Id.

Plaintiff argues that she satisfies the criteria for repeated episodes of decompensation because she had an episode for three weeks beginning in mid-July 2006, had what "should be characterized as an episode" in July 2007, had an episode for almost two months beginning in June 2009, had another episode for over a month beginning in October 2009, and had an episode for almost two weeks in March 2010.  (Pl.'s Br. at 5-7, ECF No. 18.)  In tallying her episodes, Plaintiff considers as one episode a period when she is admitted for in-patient treatment, discharged, and shortly thereafter again seeks psychiatric treatment.  For instance, the first episode began when she was hospitalized on July 17, 2006, and ended when she was discharged on August 7, 2006, from a third hospitalization.  (See id. at 5.)

- 44 -

On the other hand, the Commissioner argues that the criteria is satisfied only when an average taken by dividing the total number of episodes by the relevant four-year period results in at least twelve episodes of extended duration.  (Def.'s Br. at 7, ECF No. 23.)  The Commissioner also disagrees with Plaintiff's method of grouping incidents into a single episode.  (Id. at 8-9.)

Regardless of which party's position is the stronger, both agree that the ALJ's determination of her credibility was essential to the question whether Plaintiff is disabled under the Act.  Plaintiff argues the ALJ erred; the Commissioner argues the opposite.

"'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'"  **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting Juszcyzk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)).  When rejecting a claimant's testimony, "'the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors,'" **id.** at 1066 (quoting Dipple v. Astrue, 601 F.3d 833, 837 (8th Cir. 2010)), although the ALJ "'need not explicitly discuss each Polaski factor,'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Goff, 421 F.3d at 791).

Plaintiff challenges inconsistencies cited by the ALJ in support of his adverse credibility determination.  The first is his reference to her testimony that she only completed the eleventh grade and her other reports that she had completed the twelfth grade.  Plaintiff argues that this is not an uncommon inconsistency.  On the Disability Report, Plaintiff stated

- 45 -

that she had completed the twelfth grade.  In the history portion of her various medical records, Plaintiff consistently reported that she had completed the twelfth grade.  Indeed, her possession of a high school diploma was listed at least twice as an asset to her recovery. There was clearly an inconsistency between Plaintiff's hearing testimony and her reports over a period of several years about her education level.  The ALJ's decision to weigh this inconsistency against her credibility is permissible.  See **Goff**, 421 F.3d at 792 (noting that "ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole") (internal quotations omitted).

Plaintiff also challenges the ALJ's citations to inconsistencies in the function reports when discrediting her credibility, noting that she filled out her two function reports two years apart and attributing any differences to the "mountains of paperwork" disability applicants must complete.  (Pl.'s Br. at 10.)  The ALJ, however, did not simply refer to inconsistencies in Plaintiff's two function reports.  He referenced inconsistencies between her testimony and function reports completed once by her husband and a sister and questionnaires completed by her daughter and another sister.  He also referenced inconsistencies between the reports of the sisters and daughter.  Moreover, the second function report completed by Plaintiff described greater functioning than the one completed three years earlier, including a report that she goes outside every day and goes alone.   These inconsistencies are proper considerations and are not required to be ignored because of any hardships imposed by the application process.  See **Casey v. Astrue**, 503 F.3d 687, 695 (8th Cir. 2007) (finding it

- 46 -

permissible for ALJ to consider inconsistencies between function report completed by claimant's mother and report completed by claimant as detracting from claimant's credibility).

Plaintiff next takes issue with the ALJ's finding that it was inconsistent for Plaintiff to report that she needed to be reminded to go to the doctor's office but did not need to be accompanied there.  There is no inconsistency, she alleges, because the reminder is necessitated by her short-term memory loss.  This argument is unavailing given (a) the references in her medical records to her recent memory being intact and (b) her husband's report that she does not need to be reminded to go places.

The ALJ's citation to the inconsistency between her claims of shortness of breath on exertion and the medical evidence of mild COPD is erroneous, according to Plaintiff, because shortness of breath on exertion is typical of mild COPD.  Again, the inconsistencies between her testimony and the function reports weigh against her credibility.  Plaintiff reported that she can walk one-half mile.  Additionally, as noted by the ALJ, Plaintiff continued to smoke despite being told not to.  "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."  **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005).  See also **McCoy v. Astrue**, 648 F.3d 605, 614 (8th Cir. 2011) (ALJ did not err in discrediting claimant's statement that he could only walk fifty feet when there was evidence in record that he was able to mow "the lawn in high heat").

Plaintiff next disagrees with the ALJ's reference to her June 2009 hospitalization not being a suicide attempt, correctly noting that the records of such refer to her taking too many pills because she wanted to sleep and did not care if she died.  The ALJ's interpretation of

Plaintiff's comments when hospitalized is one inference; Plaintiff's is another.  "The fact that [the claimant] can point to some contradictory evidence in the record does not lead to a conclusion that the ALJ's decision is not supported by substantial evidence."  **Van Vickle v. Astrue**, 539 F.3d 825, 829 (8th Cir. 2008).   Additionally, the ALJ's interpretation is consistent with Plaintiff's report in June 2009 that she had had only one prior suicide attempt, and that was four years earlier, in 2005.

Plaintiff further argues that her ability to leave the house to shop for a short period of time or to have coffee with her sisters is not inconsistent with her report that she unable to leave the house on bad days.  Again, this is but one of two inferences.  The ALJ's finding that her testimony she is unable to leave the house and that there were approximately ten times when she did not go outside for three months each is inconsistent with other reports, including that of her husband, that she regularly shops and visits with her sisters is not erroneous.  Indeed, the Court notes that other evidence, including the report that the year after her alleged disability onset date Plaintiff was working  three days a week at the restaurant she and her husband owned, indicates that Plaintiff is more active than she described.[21]  See **Travis v. Astrue**, 477 F.3d 1037, 1042 (8th Cir. 2007) (when confronted with conflicting reports of claimant's daily activities, "with one supporting the ALJ's determination," the court should defer to that determination).

The ALJ found it inconsistent for Plaintiff to be able to count change and use a checkbook but not handle a savings account.  Plaintiff argues that any inconsistency is caused

_____

[21]See also note 19, supra..

by the difficulty of filling out paperwork when one is mentally ill.  Similarly, she alleges that her alcohol and drug use are typical of one with mental illness.  Plaintiff overlooks, however, that the burden of proof is on her to establish the severity of her mental illness, including its consequences.  Merely stating that it excuses inconsistencies cited by the ALJ is insufficient.

Another consideration weighing against Plaintiff's credibility was, the ALJ found, her failure to follow up with psychiatric treatment when told to do so when discharged from the hospital.  Plaintiff explained this omission to one provider by stating that she lived in a rural area and had no access to such treatment.  This explanation is unavailing.  There was a brief period when she sought such treatment and no suggestion that she had relocated during that period.  Moreover, there was evidence that Plaintiff routinely went to her restaurant, which was in a town.[22]

In her third, and final, argument Plaintiff contends that the ALJ erred in relying on Dr. Stacy's assessment because Dr. Stacy clearly did not have access to all her medical records. As noted by the Commissioner, however, the ALJ did have such access, thoroughly discussed those records, and independently determined which portions of Dr. Stacy's assessment were supported by those records and which, giving Plaintiff the benefit of the doubt, were not. Plaintiff's third argument is without merit.

_____

[22]The Court notes that the inconsistencies cited by the ALJ are but a sampling of the ones in the record.  Others include, but are not limited to, Plaintiff's constantly changing report of whether she was drinking, her report to one provider that her first husband beat her and to another provider that he had not abused her, her report to one provider that she did not have a primary care physician when she did, her report that she had been receiving psychiatric treatment for years and the lack of any supporting evidence of such, and her testimony that she did not eat or drink water when having a bad day and that eighty percent of her days were bad.

## **Conclusion**

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'"  **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and will not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  26th  day of September, 2013.